**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 1:18-cr-359 |
| v. | ) | |
| | ) | |
| | ) | Judge John D. Bates |
| THOMAS MCCORMICK, | ) | |
| | ) | UNDER SEAL |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO SUPPRESS OR, IN THE ALTERNATIVE, REQUEST FOR A *FRANKS* HEARING

This case is the result of a long-ranging FBI investigation into a website marketplace, Darkode. The investigation began over a decade ago and reached many witnesses, targets, suspects, and countries. One such suspect is Thomas McCormick. Mr. McCormick—who was a juvenile at the time this investigation began—now finds himself indicted for conduct that occurred nearly a decade ago. Not only is the conduct in this case several years in the past, the information relied upon in the search warrant for Mr. McCormick's dorm room was similarly years old at the time of application. Moreover, the affidavit supporting that warrant application omitted the material fact that agents had identified Mr. McCormick nearly three years prior to their application.

Reliance on stale information defeats probable cause in an application for a search warrant, and as a result, the fruits of a search conducted based on an improperly issued warrant should be suppressed. Here, because the application relied on information that was nearly three years old at the time of application, the evidence obtained from Mr. McCormick's personal belongings, including the computer and external storage devices seized from his dorm room, should be suppressed. Alternately, should this Court find that there was probable cause, it should still hold a *Franks* hearing to investigate why the agents failed to provide material information in the search

1

warrant application, namely the fact that they had identified Mr. McCormick as their suspect nearly three years prior to the date of application.

## I.   **Introduction and Factual Background**

Darkode, an internet forum for malware, bots, hacking services, and similar goods launched in September 2008. Indictment ¶ 35. It came under international law enforcement investigation shortly thereafter. Mr. McCormick is alleged to have been a participant and administrator on Darkode, selling and facilitating the sale of malware, hacking services, stolen credit card and personal identifier information, and other goods. *Id.* ¶¶ 29, 35. From December 14, 2009 to January 15, 2010, an undercover FBI agent purchased Zeus malware from Mr. McCormick. Specifically, Mr. McCormick advertised that he was selling the malware from December 14, 2009 to December 22, 2009, and after negotiating the terms of the sale, Mr. McCormick sold Zeus to the undercover agent on January 15, 2010 for $7,200. *See* Aff. of Special Agent David Hitchcock in Support of an Application for a Search Warrant, Nov. 25, 2013, ¶¶ 11–14, attached hereto as Exhibit 1 (hereinafter "Hitchcock Aff."). It is further alleged that Mr. McCormick undertook other activities, such as selling cookie cleaner software, participating in pay-per-install hacking activities, and holding stolen personal identifying information and bank accounts. *See* Indictment ¶ 35.

Mr. McCormick was a juvenile during this alleged activity, not turning 18 until October 15, 2010. The alleged wrongful conduct, including the controlled buys and observed sales of other malware goods occurred prior to Mr. McCormick's 18th birthday. Despite years of contact with Mr. McCormick and other participants in Darkode, FBI agents failed to ascertain Mr. McCormick's real-world identity until January 28, 2011. [1]

---

[1] In fact, federal agents had identified Mr. McCormick's permanent residence with his parents even before the January 28, 2011 identification. Agents traced relevant computer activity from "fubar" to both the

This case could have been resolved at the time the conduct was uncovered and when Mr. McCormick was identified by federal agents on January 28, 2011. *See* D. Wierzbicki email, Untitled, Jan. 28, 2011 (stating "FUBAR!!!" which was Mr. McCormick's online alias), attached hereto as Exhibit 2. However, for reasons that remain unexplained by the Government, federal agents waited nearly three years from the date of identification to secure a search warrant of Mr. McCormick's residence. In that time, Mr. McCormick graduated high school and moved several times into and out of his college dorm residences. Notably, he had ceased selling or distributing any sorts of malware or similar items. *See* Hitchcock Aff., ¶ 9 (noting that "Fubar replied, 'I don't do ransomware anymore, . . .'" in response to a query for ransomware sales in January 2013). Nonetheless, agents pursued a search warrant for Mr. McCormick's shared dorm room on or about November 25, 2013 without any ongoing evidence that Mr. McCormick was presently engaged in any sort of illicit activity at the time or even closely related in time.[2]

Curiously, the affidavit in support of the search warrant application completely fails to identify January 28, 2011 as the date on which the Government identified Mr. McCormick. In fact, it seems to go to extraordinary lengths to give the impression that the FBI had been unable to identify Mr. McCormick until sometime in 2013.[3] After outlining the controlled purchases from

McCormick family residence and Mr. McCormick's high school as early as May 2010. *See* FBI Elec. Comm., *To Request That Boston Division Conduct Logical Investigation*, Oct. 18, 2018 (request to identify individual using "fubar" moniker at McCormick family residence and Mr. McCormick's high school in May 2010), attached hereto as Exhibit 3.

[2] The exact date on which the application for search warrant was filed is unknown to undersigned counsel. Undersigned counsel requested certain information from the Government, and in its response the Government produced, via email, a Microsoft Word version of the affidavit in support of the application for the search warrant. The file did not include a date on which the affidavit was sworn, but included the date of November 25, 2013 in the file name of the electronic document. The search was executed on December 5, 2013.

[3] Up until Mr. McCormick's 21st birthday, on October 15, 2013, the pre-majority conduct from 2009 to 2010 could *only* be charged as juvenile offenses. *See* 18 U.S.C. § 5031. Further, the offenses are not predicates for possible transfer to adult status. *See* 18 U.S.C. § 5032.

"fubar" (Mr. McCormick's online alias) in January 2010, the affidavit jumps forward in time in a section titled "Fubar and Other Aliases Used by McCormick." *See* Hitchcock Aff., ¶¶ 17–18. This section focuses on other usernames, email addresses, and websites that Mr. McCormick used or accessed other than "fubar" at various points during the FBI investigation. This aspect of the investigation was apparently conducted using confidential source ("CHS"), records from Google and Microsoft, and WhoIs, a publicly available search engine used to identify registrants of domain names and IP addresses. *See id.*

The sole claims in the affidavit regarding Mr. McCormick's activity as an administrator from 2012 to the date of application for the warrant are limited to generalized claims of administrator activity by "fubar" from the CHS. *See* Hitchcock Aff. ¶¶ 8, 17(c). Notably, these claims of ongoing activity are limited to general descriptions and is notably void of any specific instances of purchases, sales, or facilitating of the same. Further, the allegations center around the activity of certain IP addresses, not of Mr. McCormick specifically. During this time, Mr. McCormick was aware that another person, unknown to him, had been accessing his "fubar" account periodically. Moreover, in the instances that Mr. McCormick did use his "fubar" account from 2012-2013, his activity was largely social—using messenger to chat with friends about coding—or just general browsing of Darkode (which is not possible without logging into an approved account).

The connection between the undercover purchases of malware in 2010 and the application for a search warrant in December 2013 is limited to apparent ongoing internet activity and the affiant's boilerplate representation that in his experience documents relating to computer and internet activity are portable and often remain available several years after their original use. *See id.* at ¶¶ 24–28. The information provided in the affidavit glosses over the fact that Mr. McCormick

4

would have changed residences multiple times from 2010 to 2013 due to starting his undergraduate studies at University of Massachusetts, Amherst and residence in other cities for summer internships. Despite Mr. McCormick's frequent relocation during this time frame, the search warrant still seeks items including:

- Records;

- Computer hardware;

- Computer software;

- Computer-related documentation; and

- Storage media, such as hard drives, CDs, DVDs, USBs or thumb drives, or memory cards.

*See* Hitchcock Aff., Attachment B. Yet the warrant does not describe why the Government expects the items detailed in the Affidavit related to "fubar" or Darkode activity to be located in Mr. McCormick's dorm room at that juncture. Further, there is no information in the affidavit to explain why the FBI waited almost three years to pursue this warrant from when it first identified Mr. McCormick as "fubar" in January 2011.

## II.   Evidence Obtained Pursuant to the Search Warrant Should Be Suppressed.

### a.   Legal Standard

The Fourth Amendment of the U.S. Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. To be valid, a neutral and detached judicial officer must find that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime, or contraband may be found in the place to be searched. *Johnson v. United States*, 333 U.S. 10 (1948), *Warden v. Hayden*, 387

U.S. 294 (1967). Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. *Gates*, 462 U.S. at 230.

Search warrants must describe the place to be searched and the items to be seized with particularity. *See Stanford v. Texas*, 379 U.S. 476, 481–85 (1965) (describing the purpose of and how to establish particularity). The particularity requirement should "make[] general searches . . . impossible and prevent[] the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). Therefore, probable cause to search a particular place demands "a fair probability that contraband or evidence of a crime will be found in [the] particular place." *Gates*, 462 U.S. at 238.

Document searches present unique particularity concerns. As the Supreme Court stated:

> [T]here are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized . . . . [R]esponsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

*Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). These issues have exploded in the digital era, where "[c]omputers . . . often contain significant intermingling of relevant documents that the government has no probable cause to seize." *United States v. Vilar*, No. S305CR621KMK, 2007 WL 1075041, at *35 (S.D.N.Y. 2007) (internal citation and quotation marks omitted).

Facts presented to support a warrant must be "so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*." *Sgro v. United States*, 287 U.S. 206, 210 (1932) (emphasis added). If the information contained in the affidavit is too outdated to support probable cause, it is "stale." *See, e.g.*, *Schoeneman v. United States*, 317 F.2d 173, 177–78 (D.C. Cir. 1963) (finding no probable cause to establish that classified documents would be in a defendant's house when they were last seen 107 days prior to application for the warrant).

Should a search warrant fail on any of these grounds such that probable cause fails to exist, then any evidence that is seized subject to such a faulty warrant was unlawfully seized and must be suppressed. *See United States v. Leon*, 468 U.S. 897, 918 (1984) (discussing the purpose of the exclusionary rule is to deter police misconduct and noting that such requests are to be evaluated on a case-by-case basis). In assessing the reasonableness of an officer's reliance on a search warrant, courts consider "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922, n.23). If a reasonable officer would have known that a warrant was "so lacking in indicia of probable cause as to render official believe in its existence entirely unreasonable," then suppression is the appropriate remedy. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (quoting *Leon*, 468 U.S. at 923).[4]

### b.  The Information in the Affidavit Was Stale and Thus Insufficient to Establish Probable Cause that Evidence of a Crime Existed in Mr. McCormick's Dorm Room.

Probable cause must exist at the time of application for a search warrant, and therefore, "freshness of the supporting evidence is critical." *United States v. Washington*, 775 F.3d 405, 408

---

[4] While this motion focuses on the grounds for suppression of the physical evidence recovered during the execution of the search warrant, it should not be construed to waive any other grounds for suppression of evidence, including any statements Mr. McCormick gave during the search of his dorm room. Mr. McCormick reserves his right to challenge the admissibility of these statements at a later time.

(D. C. Cir. 2014) (citing *Schoeneman*, 317 F.2d at 178). The amount of time that has passed, along with the type of property sought and the nature of the criminal activity should be considered. *See United States v. Singh*, 390 F.3d 168 (2d Cir. 2004). When assessing whether the information in a search warrant is stale, the relevant question is whether the items sought are currently located in the place to be searched. *See United States v. Harris*, 735 F.3d 1187 (10th Cir. 2013).

The longer the delay between discovery of critical evidence and application for a search warrant, the more reason to find the supporting information is stale and that probable cause is lacking. The D.C. Circuit has concluded that suppression of evidence was the appropriate remedy based on a delay of 107 days in application for a warrant. *See Schoeneman v. United States*, 317 F.2d 173 (D.C. Cir. 1963). In *Schoeneman*, the defendant was accused of various crimes based on his alleged improper possession and use of classified government documents. The supporting affidavits for the search warrants at issue indicated that the defendant was engaged in an ongoing conspiracy and therefore books observed in his home on one day were likely to still be there over three months later. The Court disagreed. *Id.* at 177. Specifically, the Court noted that even if this was an ongoing conspiracy, there was "no allegation that the books had not been moved in the intervening three and one-half months or, indeed, that [the defendant] himself had not moved." *Id.*

In another case, the D.C. Circuit affirmed a trial court's finding that information in a search warrant was stale when there was 109 days from finding of the evidence to application for the search warrant. *United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001). In *Webb*, a warrant issued for documents in relation to a drug-trafficking conspiracy. However, agents did not seek the search warrant until over three months after the last drug transaction took place. *Id.* The Government argued that it was reasonable for a magistrate to assume that person might be engaged in drug transactions beyond the last observed infraction. Yet, the mere assumption that such

activity would continue and that therefore records would be available was insufficient. *Id.* In fact, the Court noted that the "issuance of this warrant [was] troubling." *Id.* at 904.

Then, in *United States v. Lindsey*, the D.C. District Court concluded that a delay of 178 days from the taking of a photograph of evidence to the application for a warrant rendered the information too stale to establish probable cause. 596 F. Supp. 2d 55, 58–59 (D.D.C. 2009). In that case, the federal agents investigating the defendant had been provided a photograph of a home with illegal firearms from local police. The agents did not secure a search warrant until nearly six months later. *Id.* at 59. The Court concluded the warrant did not issue on probable cause because the "photographs were the only evidence of criminal activity that was linked to the defendant or his residence, and those photographs were stale[.]" *Id.*

As courts in this jurisdiction have found delays of 107 to 178 days to be "troubling," certainly the delay here of 1032 days[5] creates significant cause for concern. Agents first identified Mr. McCormick as the target of their investigation on January 28, 2011. At that time, presumably, the agents would have wanted to secure computers, hard drives, and external storage devices—the same types of evidence ultimately sought several years later to support their investigation. All of these types of evidence are extremely portable. When (and if), Mr. McCormick had such evidence in his residence in January 2011, the affidavit fails to demonstrate how or why a magistrate should assume those same materials would be with Mr. McCormick in his dorm room several years later. During this time, Mr. McCormick had relocated from his parents' house, to a dorm room at University of Massachusetts–Amherst, to a summer internship in Seattle, Washington and back to Amherst. *Compare with Schoeneman*, 317 F.2d at 177 (noting that the defendant, let alone his

---

[5] Based on an application date of November 25, 2013, *see supra* n. 2.

documents, could have moved during the intervening three and a half months between initial observation of documents and application for a search warrant).

The Government attempts to overcome this issue by explaining that in the affiants' experience, portable electronic devices are often stored by individuals at their residence.*, see* Hitchcock Aff. ¶ 23, and that a confidential human source ("CHS") claimed that McCormick maintained an administrator's role on Darkode through 2013.  However, conclusory, boilerplate language that in an agents' experience defendants that use electronic devices are likely to behave similarly is insufficient to establish probable cause. *See, e.g.*, *United States v. Raymonda*, 780 F.3d 105, 119 (2d Cir. 2015) (concluding that a boilerplate remark about how similar defendants collect and access data "did not plausibly suggest the existence of additional evidence, not otherwise disclosed in the affidavit" that would indicate this specific defendant acted in the same manner).

Here, there is no evidence provided in the search warrant affidavit that would allow a magistrate to conclude that the evidence Mr. McCormick may have possessed in 2011 was still with him several years later at a completely different residence. Although the affidavit does acknowledge that Mr. McCormick lived in different residences over the intervening years and may have periodically accessed the website at issue, it fails to demonstrate that the physical items sought remained with him and were with him in the place to be searched. In requesting a warrant to obtain everyday items such as computer hard drives, storage devices, software, and computer-related documentation, the Affidavit completely disregards the high probability that such items as related to Darkode and "fubar" activity were highly unlikely to be with Mr. McCormick years after his most significant activity on the website. Not only did Mr. McCormick move several times during these intervening years, he began college, a typical time to replace and update computer equipment—which is exactly what Mr. McCormick had done. Before beginning his studies at

University of Massachusetts, he purchased a new laptop and related accessories. Instead of considering this natural transition and change in Mr. McCormick's circumstances, the FBI assumed without any evidence that Mr. McCormick was carrying years old computer equipment around with him everywhere he went.

A specific accusation by the CHS is used to "freshen up" the affidavit, but the one tangible conversation between the source and the defendant includes specific denials of criminal involvement by Mr. McCormick: In the January of 2013 exchange, Mr. McCormick denied any ongoing activity, stating he "doesn't do ransomwear [sic]" any more and discussing cashing out from ransomware usage in decidedly past-tense terms. Beyond this, there is no indication in the affidavit that the FBI had concerns about ongoing hacking, accessing of Darkode, use of malware, or similar activity that might establish probable cause. While the search warrant goes to great lengths to show the various ways the FBI confirmed Mr. McCormick's identity, it does not allege any specific, ongoing activity that could serve to make the affidavit fresh.[6]

At most, there are vague, unspecified references to Mr. McCormick logging into his "fubar" account over time. But there are no allegations in the warrant application that during these intermittent log-ins that Mr. McCormick was undertaking any unlawful activity. In fact, during the only interaction between the CHS and Mr. McCormick cited in the affidavit during the post-2011 time frame, Mr. McCormick **denies** any ongoing ransomware sales activity. Moreover, while Mr. McCormick did log in as an administrator at this time, he did so because logging in was required to browse the site and instant message with his friends. He was not actively undertaking

---

[6] Undersigned counsel has requested that the Government provide discovery regarding the "last accessed" date of files recovered from Mr. McCormick's computer, hard drives, external storage devices, and other equipment during the search. Those records may show that Mr. McCormick was not actively using the files, further demonstrating the staleness of the information relied upon in the affidavit.

administrator duties on a meaningful basis after 2011.[7] As the entire warrant application is predicated on actions taken nearly three years prior to the date of application, the evidence obtained must be suppressed.

### c. The Affidavit Supporting the Search Warrant Contained Material Omissions Made with (at Least) Reckless Disregard for the Truth.

Beyond the stale information, the affidavit completely fails to disclose that Mr. McCormick's identity was uncovered **years** prior to the application for the search warrant. "Where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment . . . requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154 (1978). This same showing and right to a hearing also applies to material omissions. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008); *Lindsey*, 596 F. Supp. 2d at 59. Thus, even if the Court were to conclude the search warrant affidavit contained probable cause, it should order at *Franks* hearing to investigate this material omission. "By reporting less than the total story, an affiant can manipulate the inference a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all meaning." *United States v. Stanert*, 762 F.2d 775, 783 (9th Cir. 1985).

Courts may infer reckless disregard for the truth when the "omitted information was critical to the probable cause determination." *United States v. Ali*, 870 F. Supp. 2d 10, 29 (D.D.C. 2012) (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 81 (1st Cir. 2005) and *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991); *see also United States v. Simmons*, 771 F. Supp. 2d 908,

---

[7] Further, Mr. McCormick believes that another, unidentified person was accessing his account during this timeframe. Defense counsel has requested access logs for Darkode from the Government to explore this issue.

917 (N.D. Ill. 2011) (noting that an affiant's state of mind can be inferred when there are obvious reasons for omitting the facts). Surely, the date on which the Government identifies the defendant at issue is critical information. *Cf. United States v. Huggins*, 733 F. Supp. 445, 447–48 (D.D.C. 1990) (Revercomb, J.) (suppressing evidence when affidavit in support of search warrant failed to state the time and date of the critical controlled purchase because there was no way for a judicial officer to determine whether the information was stale).

The last overt act described in the supporting affidavit occurred in January 2010 when the undercover agent purchased the Zeus bot from "fubar" and had a handful of subsequent conversations over an online messaging service about other malware services. Hitchcock Aff. ¶¶ 14–16. The affidavit then goes into painstaking detail to describe the other manners in which the FBI identified Mr. McCormick's online activity, including through documents from Microsoft and Google, its undercover informant, and a pen trap. The only temporal specifics provided in the affidavit was that the undercover informant indicated "fubar" accessed Darkode between October 2012 and January 2013, with no details about the activity that took place during that time, and that the FBI obtained a pen trap of Mr. McCormick's dorm room in early 2013. The remaining information, such as when the Government obtained the documents from Microsoft and Google is notably absent.[8]

The affidavit in support of the search warrant completely fails to provide any information that would allow the neutral magistrate to understand the FBI had established Mr. McCormick's real-world identity nearly three years prior to the application. Rather, the affidavit undertakes a protracted discussion of the other efforts to identify other usernames, emails, or internet activity related to Mr. McCormick. Such exposition makes it appear as if the Government required years

---

[8] Based on information provided to undersigned counsel, it appears these documents were provided to the FBI as early as August and September 2012.

of investigation and pursuit of myriad resources to establish that Mr. McCormick was "fubar." Yet this ongoing investigation was, as most, supplementary to the information already obtained from the start of the investigation in 2008 through the date of identification of Mr. McCormick in January 2011.

This is likely because drawing attention to the timeline of events would highlight the incredible delay between when the Government had identified "fubar" and when they finally applied for a search warrant. The descriptions of the various usernames, online services, and other details serves only to make it appear as if the Government had spent 2010 to 2013 attempting to ascertain "fubar's" real-world identity. However, the agents on this case had identified in him in January 2011 but failed to take any action, despite the apparent excitement upon uncovering Mr. McCormick's identity.[9] A reviewing magistrate would presumably want to know when the subject of a search warrant was first identified and the reason for the subsequent delay in requesting such a warrant. Rather than confront these facts in the application, the Government overcomplicates the information provided to make it appear as if they had only just been able to identify Mr. McCormick and his residence in a college dorm room.

---

[9] Further, it is during this delay that Mr. McCormick turned 21 years of age, resulting in the Government being able to charge him as an adult for behavior that occurred when he was a juvenile. *See* 18 U.S.C. § 5031 ("a 'juvenile' is a person who has not attained his eighteenth birthday or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday[.]") Of course, if upon review of further evidence or during testimony at a *Franks* hearing, it becomes clear the delay was to advantage the Government's case, this would amount to a violation of Mr. McCormick's due process rights and dismissal would be the appropriate remedy. *See United States v. Marion*, 404 U.S. 307, 324 (1971).

### III.    Conclusion

Investigation of computer-based crimes is complicated and time-consuming. However, these complications should not serve as justification for the Government's failure to timely seek a search warrant. When the Government identified Mr. McCormick as "fubar," it had all the information it needed to seek a search warrant for the portable electronic goods related to the investigation. Yet the Government waited three years to pursue a search warrant, the only rational explanation for which was to "run the clock" until Mr. McCormick turned twenty-one years old and thus would no longer have the protections of juvenile status.  Knowing the problem with these facts, the Government did not clearly inform the magistrate to whom the application was submitted of the delay between original identification and current grounds for probable cause. Given this unprecedented delay, this Court should suppress the fruits of this search because the underlying warrant lacked probable cause. In the alternative, this Court should order a *Franks* hearing to determine why the Government failed to inform the magistrate that it had identified "fubar" several years prior to the date of application but failed to act.


Dated: May 31, 2019                          Respectfully submitted,

                                             A. Jeff Ifrah
                                             James M. Trusty
                                             IFRAH PLLC
                                             1717 Pennsylvania Ave. NW, Suite 650
                                             Washington, DC 20006
                                             (202) 524-4140 – Tel.
                                             (202) 524-4141 – Fax
                                             jeff@ifrahlaw.com
                                             jtrusty@ifrahlaw.com

                                             *Attorneys for Defendant Thomas McCormick*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 31, 2019, I will electronically transmit the foregoing document to counsel for the Government via electronic mail.

James Trusty
IFRAH PLLC
1717 Pennsylvania Ave. NW
Suite 650
Washington, DC 20006
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
jtrusty@ifrahlaw.com