## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Crim. No. 18-0359 (JDB)** |
| | : | |
| **THOMAS KENNEDY MCCORMICK,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT DUE TO PRE-INDICTMENT DELAY

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, opposes Defendant's Motion to Dismiss the Indictment for Pre-Indictment Delay (Document 36). Defendant's motion should be denied, as he fails to meet either of the two required showings. Not only does he fail to proffer any evidence that any purported delay was intended to seek a tactical advantage, he also can show no prejudice: the indictment charges Defendant as an adult for crimes he committed as an adult (even if his participation in the conspiracy began when he was a juvenile). Rather, as set forth below, any supposed "delay" was due to investigative demands in a complex, international investigation of numerous defendants. As such, Defendant cannot make the requisite showing that he is entitled to the extraordinary relief of dismissal.

### STATEMENT OF FACTS

**Investigation Before the Search and Interview of Defendant on December 5, 2013**

The Federal Bureau of Investigation (FBI), Hawaii Field Office, first began a criminal investigation of Darkode.com (also called "the Darkode") around 2008, shortly after the site first appeared on the internet.

The Darkode was an exclusive, international, online forum and marketplace for criminals to develop and share hacking tools and schemes. The Darkode's membership was by invitation only, which made it more difficult, but not impossible, for the FBI to infiltrate. Through the use of confidential human sources and FBI agents posing as computer hackers, the FBI soon learned that the Darkode users/members were primarily interested in the use, sale, and deployment of malware for the purpose of generating revenue. In order to preserve anonymity, and primarily to evade detection by law enforcement, members interacted online using aliases (e.g., email monikers), encrypted email and internet chat relay programs, and they favored the use of then existing internet money processors which failed to comply with the Bank Secrecy Act and thus could be used for anonymous or pseudonymous payments.

The impact of the Darkode and the malware its members created, generated, and sold, was international. Its membership certainly was international. For example, early efforts by FBI in coordination with various international law enforcement officials resulted in the 2011 – 2012 arrests of certain leaders of the Darkode in Spain and in Slovenia.[1]

Despite law enforcement disruptions after 2008, the Darkode enterprise persisted. The FBI learned that members of the Darkode were posting notices warning other members that the forum had been infiltrated by federal law enforcement as soon as its leaders began to be arrested. These

---

[1] The arrests included co-defendants Matjaz Skorjanc a/k/a "iserdo" and "serdo" in Slovenia; Mentor Leniqia/k/a "iceman," from Serbia but residing in Slovenia at the time; and Florencio Carro Ruiz a/k/a "NeTK" and "Netkairo," of Spain. Slovenia declined to extradite Darkode defendants arrested in their country (charged at the time only by criminal complaint, not indictment) because their foreign laws prohibited extradition of its citizens and foreign nationals in Slovenia. Slovenia did however prosecute based upon evidence shared with them by U.S. authorities. Spain declined to extradite Ruiz in 2012 but used evidence provided to them by U.S. authorities to prosecute in Spain. Following return of the current indictment, the government has resumed efforts to obtain these foreign nationals.

notices advised other members to be careful who they were dealing with online. These warnings demonstrated that the forum continued their criminal enterprise despite law enforcement efforts to disrupt the criminal website.   Not all of the Darkode's membership and leadership were arrested in 2011-2012. As described below, another large arrest of the Darkode leaders followed in 2015 in Pennsylvania and Wisconsin.[2]

**Investigation of the Defendant**

Investigation as to a member and administrator using, among others, the moniker Fubar (later identified as Defendant, Thomas Kennedy McCormick), began as early as the end of 2009. In December 2009, an FBI undercover agent successfully infiltrated the Darkode forum and began communicating with a member/administrator who identified himself as Fubar. Fubar claimed that he was selling the latest Zeus malware on behalf of another Darkode member who had created the malware and posted it for sale on the Darkode forum. Fubar was instrumental in selling of the Zeus malware (a banking Trojan virus that when installed on an unsuspecting victim's computer, harvested personal identification information and banking credentials from unsuspecting victims). In January 2010, Fubar negotiated the sale on behalf of another forum member for $7,200 to the FBI undercover agent.

Establishing who was using the email moniker Fubar did not end the investigation into Darkode because all of the forum members used email monikers to afford them anonymity for their criminal endeavors.   Nor did it end the investigation of Fubar, for investigators continued seeking evidence to build their cases against McCormick/Fubar – and needed to identify not just

---

[2] Some arrests and prosecutions were done covertly in order to afford members and administrators an opportunity as cooperating defendants in pursuit of still other criminal associates of the Darkode. As described below, after he was searched and interviewed in December 5, 2013, Defendant was afforded a similar pre-indictment opportunity.

who used this moniker, but to assess all related criminal activity, including under different aliases and names.

Law enforcement agents used a combination of infiltrators and informants to establish the real world identities of other forum members and administrators. The investigation also employed the use of sealed grand jury subpoenas and search warrants. This process, normally slow and tedious, was made even more so because Darkode participants regularly used a multitude of email monikers to obfuscate their real identity. In addition, the investigation involved obtaining evidence via Mutual Legal Assistance treaty (MLAT) requests from various countries, which also involved significant time and effort, and depended upon coordination for foreign law enforcement.

The investigation of McCormick, in fact, proceeded in parallel with various other investigations of Darkode subjects being conducted in United States and by numerous foreign law enforcement agencies. For example, in 2015, the U.S. Department of Justice in conjunction with several U.S. Attorney's Offices, announced the arrest of another large segment of Darkode members and leaders (called administrators). The Department's July 15, 2015 press release specifically identified ten individuals charged in, variously, the Western District of Pennsylvania (5 defendants charged), the Eastern District of Wisconsin (one defendant), the Eastern District of Louisiana (2 defendant), and the District of Columbia (McCormick's 3 co-defendants, charged by complaint at that time). Moreover:

> The charges announced today are part of a coordinated effort by a coalition of law enforcement authorities from 20 nations to charge, arrest or search 70 Darkode members and associates around the world. The nations comprising the coalition include Australia, Bosnia and Herzegovina, Brazil, Canada, Colombia, Costa Rica, Cyprus, Croatia, Denmark, Finland, Germany, Israel, Latvia, Macedonia, Nigeria, Romania, Serbia, Sweden, the United Kingdom and the United States. Today's actions represent the largest coordinated international law enforcement effort ever directed at an online cyber-criminal forum.

*See* U.S. Department of Justice Office of Public Affairs, *Major Computer Hacking Forum Dismantled*, July 15, 2015, available at https://www.fbi.gov/contact-us/field-offices/pittsburgh/news/press-releases/major-computer-hacking-forum-dismantled .

Although Fubar and others of the Darkode forum were adept at misdirecting their actual internet protocol addresses (IP addresses) through the use of proxy computers, agents thought they had linked an IP address used by Fubar to a house in Cambridge, Massachusetts. Based on the evidence they had gathered at that time, they were looking for a young male at that address. In 2010, the FBI conducted surveillance of the address but reported that no one there fit the description (perhaps because McCormick was away at school at the time of surveillance.) The investigation continued as to Fubar and others and on January 28, 2011, FBI personnel discovered that Massachusetts had recently issued a driver's license to a Thomas Kennedy McCormick at the Cambridge, Massachusetts address that was the subject of recent unsuccessful surveillance. Another agent in the investigation forwarded an email with a driver's license photo attached of Defendant. The email contained a one word explanation: "FUBAR!!!" The email and license are attached is Exhibit 1. The license shows that McCormick was born October 15, 1992, which would have made him eighteen years old by October, 2010. (The Government does not dispute the date of birth.) Although that information was important, it did not end the investigation. Agents still had to connect all the other monikers linked to Fubar to McCormick, to eliminate the possibility that others were using those email monikers as well.

Using a series of search warrants and Electronic Communications Privacy Act orders (18 U.S.C. § 2703(d)), investigators believed that as of September, 2013, in addition to using the email moniker Fubar, Thomas Kennedy McCormick used at least the following additional email monikers and IP addresses to conduct criminal Darkode forum business: infestedtom@gmail.com,

not.a.russian.spammer@gmail.com, tkmccormick@gmail.com, root@botnet.biz, botnet.biz, and an Internet Protocol address of 46.166.143.138. (IP addresses are numbers uniquely assigned to electronic devices used to communicate on the internet.)

On December 5, 2013, FBI agents applied for a warrant to search and seize digital devices believed to be in the possession of Defndant at his University of Massachusetts dorm room. The FBI expected that the recovery of such digital evidence and the discovery of the various emails which Fubar had used as alias monikers would link Defendant to not only Fubar, but to other email monikers also used in connection with the criminal activity on the Darkode forum. While the initial discovery of the real world identity of one moniker, like Fubar, is significant, it did not end the investigation nor definitively establish that McCormick used all the other email monikers at issue. Critically, "identification" of a subject does not necessarily end an investigation. Commonly, as here, investigators continue to assemble sufficient identification evidence to persuade a jury at trial, and continue to investigate the full scope of offenses committed, even after a subject has been initially identified.

**Continued Investigation After December 5, 2013**

Thereafter, the investigation continued and linked the various email monikers to the real world identity of Defendant. Among other things, forensic analysis of the devices seized in December, 2013, took another eight to nine months as many were encrypted by passwords. During Defendant's voluntary interview with the FBI on December 5, 2013, he admitted to using a number of the email monikers at issue but did not provide accurate passwords for all of the devices seized.

Defendant was not arrested on December 5, 2013. This was not an attempt to gain a tactical advantage in the prosecution – and there is no evidence suggesting that. Rather, as is common in investigations, particularly ones involving numerous criminal participants, following the search

and interview, the Government assessed whether it could enlist his assistance as a covert cooperating defendant in the continued effort to dismantle the Darkode enterprise. And (as noted above) the government continued its investigation through, for example, forensic analysis, to assess the full scope of Defendant's offenses and the evidence against him.

**Defendant's Debriefings**

Months later, with the assistance of an attorney, Defendant signed the first of at least two such debriefing agreements (Ex. 2 and Ex. 3, attached) and thereafter participated in a series of meetings with law enforcement in which he provided information about his activities and the activities of others on the Darkode forum. The covert debriefings gave Defendant an opportunity to demonstrate his value to law enforcement and gave the Government an opportunity to assess his credibility, truthfulness, and whether he could substantially assist the investigation or prosecution of others. Those debriefings occurred on August 4, 5, and 6 of 2014; November 29 and 30, 2016; September 25, 2016; and on December 7, 2017.

By on or about August 14, 2017, the government extended Defendant a proposed cooperation plea agreement. The prosecutor at that time was unable to obtain a response from the defense. Then, in September, 2017, due to a medical issue, the lead prosecutor could not continue on the case.[3] Beginning later in September 2017, new AUSAs contacted defense counsel and again sought a response to the plea offer, and discussed a continued debriefing – not least to meet the new prosecutors. A further debriefing was held, on December 7, 2017.

At that last meeting, Defendant declared that he was intent on reaching an agreement.

---

[3] Defendant suggests (at 2) that the notion of a cooperation plea was only raised by new prosecutors "in mid-2018." That is false. Not only was Defendant's criminal exposure obvious throughout the course of debriefing, the original prosecutor extended the plea agreement in August 2017.

To that end, he eventually signed an agreement tolling the running of the statute of limitations (which excluded about 92 days). Ultimately, however, on or about Memorial Day 2018 – about ten months after it had been extended – Defendant rejected the Government's plea offer (and made a no-jail-time Rule 11(c)(1)(C) plea counter-offer which the Government immediately rejected). The case was then consolidated with the pending prosecution of 3 co-defendants and proceeded to an indictment.

## THE OFFENSES CHARGED IN THE INDICTMENT

The seven offenses charged in the indictment were all committed after the Defendant reached the age of majority (eighteen years old) on October 15, 2010 – even if some portions of the offenses began before then. That is,

Count One (RICO Conspiracy, 18 U.S.C. § 1962(d)) alleges that from "September, 2008, through December 5, 2013," Defendant McCormick (and others) "conspired to . . . conduct and participate" in the Darkode Enterprise, with acts in violation of various laws, such as bank fraud. Indictment ¶ 31. The offense included numerous overt acts taken after the Defendant became an adult, including:

- Through 2011, McCormick took various steps to create and sell the ngrBot malware, such as creating the malware with others (March 21, 2009 through June 11, 2011) and advertising for its sale on Darkode (February 13, 2011 to July 11, 2011). Indictment ¶¶ 77-79.
- In August 2012, McCormick and co-conspirator "Snipa" intruded into a website ziddu.com, discovered vulnerabilities to steal 4.8 million email addresses and passwords, and posted that discovery for sale on Darkode. Indictment ¶ 83.
- On December 5, 2013 Defendant possessed fifteen or more unauthorized access devices with the intent to defraud. Indictment ¶ 85.
- On December 5, 2013, McCormick possessed credit card numbers and other personal identification information of others. Indictment ¶ 86.

Count One also included acts that occurred before Defendant reached his eighteenth birthday, but while he was an active member of the Darkode enterprise, such as the sale of the Zeus malware to

the undercover agent between December 2009 and January 2010.  Indictment ¶¶ 80-82.

Count Two (Wire and Bank Fraud Conspiracy, 18 U.S.C. § 1349) alleges for the same period, a conspiracy to commit wire fraud and bank fraud, incorporating the same overt acts that straddled Defendant's age of majority, i.e., were committed while he was a juvenile and continued after he reached the age of majority.

Counts Three to Seven (Aggravated Identity Theft, 18 U.S.C. § 1028A) relates to Defendant's continuing to possess and use, on December 5, 2013, the identities/access devices (that is, credit card numbers) of several enumerated victims.

## STATUTE OF LIMITATIONS

Although not directly relevant, there is no statute of limitations concern in this case. Nonetheless, although Defendant wisely does not argue that the Indictment is barred by the statute of limitations, the defense nonetheless inaccurately insinuates that the Indictment was returned on the last day before the limitations period expired, citing an excerpt of the grand jury transcript showing a question asked by one of the grand jurors foreshadows the constitutional dilemma incorporated by their Motion to Dismiss.  At most, however, the transcript merely expresses a juror's attempt to clarify when the statute of limitations is set to expire, based on the juror's recognition that the indictment return (in early December 2018) was close to the December 5, 2013, date of the last overt acts committed by Defendant in the racketeering enterprise, bank/wire fraud conspiracy, and aggravated identity thefts.

As a matter of law, there is no limitations issue.  First, the applicable statute of limitations period was tolled for an additional 92 days because Defendant signed a written consent to an extension for that number of days in hopes of facilitating a plea agreement. Attached is Exhibit 4, an excerpt of the entire relevant portion of the grand jury transcript, pages 85-88.  Exhibit 4.

Second, the applicable statute of limitations period is ten years for RICO conspiracies "to the extent that the racketeering activity involves a violation of section 1344," see 18 U.S.C. § 3293(3), and for conspiracies to commit bank fraud, see 18 U.S.C. § 3293(1), and wire fraud "if the offense affects a financial institution." 18 U.S.C. § 3293(2).

## LEGAL ANALYSIS

The defense seeks dismissal of the indictment claiming that the government delayed indicting Defendant in order to gain a tactical advantage, and that this delay unfairly prejudices Defendant's opportunity to get a fair trial. The essence of the defense's complaint is that the government could have indicted Defendant for crimes he committed as a juvenile (i.e., crimes committed before October 15, 2010) before Defendant turned twenty one. Defendant claims that this delay prevented Defendant from obtaining the protections afforded by the juvenile delinquency system under the Federal Juvenile Delinquency Act (JDA), 18 U.S.C. § 5031 et seq. (Twenty-one is the age at which the federal court loses jurisdiction under the JDA.)

Defendant's claim is factually and legally wrong. First, there was no government intent to delay to gain tactical advantage, and Defendant proffers no evidence to the contrary. Second, Defendant has been charged with crimes he committed as an adult – that is, the offenses that continued until December, 2013 – not juvenile offenses. Whether Defendant was charged with those offenses immediately on December 5, 2013, or in 2018, the offenses were committed when he was an adult and he would have been charged as an adult.

The defense claims that since the FBI learned that "Fubar" was the email moniker for Defendant, on January 28, 2011 (when Defendant was eighteen years old), the FBI could have/should have arrested him while he was eighteen and charged him only with aiding and abetting the sale of the Zeus malware, the offense he committed December 2009 through January

2010, while he was still seventeen years old.  But this ignores Defendant's later offenses – i.e., the ones charged in the Indictment.  And Defendant presents no facts showing that the delay in indictment/arrest was intentional, and assert none to show that the investigation was deliberately slowed so that the indictment would be returned after Defendant was twenty-one years old.  Indeed, there are no such facts in support of their claim because there was no intent on the part of the investigators or the prosecution to delay the indictment to avoid the possibility of juvenile jurisdiction.

1. **Relevant legal principles**

The Government and the defense agree that the constitutional significance of any pre-indictment delay, if it exists at all, begins with an analysis under United States v. Marion, 404 U.S. 307 (1971).  In Marion, the Supreme Court upheld the application of a two part conjunctive test for determining whether an indictment must be dismissed under the Fifth Amendment Due Process Clause for delay. The two prongs of the test require that "the pre-indictment delay ... [1] caused substantial prejudice to [the defendant's] rights to a fair trial and [2] that the delay was an intentional device to gain tactical advantage over the accused." Id. at 324.  In Marion, the defendant could not show an intentional delay so the Court declined to find a procedural due process violation. Id. at 325-326.  It also rejected the idea that the fact that "memories will dim, witnesses become inaccessible, and evidence be lost" constitutes substantial prejudice that warrants dismissal of an indictment. Id.  In fact, the Court noted that "[p]ossible prejudice is inherent in any delay, however short; it may also weaken the Government's case." Id. at 322.

2. **Defendant proffers nothing to show intentional delay to gain advantage.**

Setting aside whether delay alone constitutes substantial prejudice to a fair trial under the first prong of the Marion analysis, the defense proffers no facts from which the court could infer

that the Government delayed to indict Mr. McCormick to gain a tactical advantage, that is, by waiting just until Defendant was no longer eligible to be tried under the JDA. The allegation is bald and conclusory.

### Up to December 2013.

As set forth above, there were no intentional delays in the investigation to await Defendant's age of majority. The investigation of a complex, years-long conspiracy with multiple co-conspirators each a sophisticated hacker dedicated to anonymizing their true identity, which involved compiling myriad sources of evidence (such as international records and forensic analysis) took an ordinary course motivated only by a need to do a thorough investigation, to pursue the possibility of Defendant's covert cooperation. Put simply, any purported "delays" encountered were normal and not the product of an intentional delay to wait until Defendant was over twenty-one years old to indict.

Notably, as charged in the Indictment, Defendant's participation in Darkode did not cease and was not limited to his sale of the Zeus banking Trojan malware December 2009 through January 2010. To the contrary, as the Government's investigation proceeded, so did the conspiracy and Defendant's participation in it. By the December, 2013 execution of the dorm room search warrant, the Government compiled evidence that Defendant continued to participate in Darkode as an adult. For instance, the evidence showed that Defendant had logged on to the Darkode forum as Fubar, an administrator and leader of the Darkode, 631 times in 2012 through September, 2013. These "logins" occurred while he was at the ages of twenty to twenty-one—beyond the age of majority.

On or about January 28, 2011 – after Defendant had already turned eighteen – the FBI investigation did reveal that Defendant was born on October 15, 1992, and had a driver's license

12

showing an address in Cambridge, Massachusetts. But the Government would not have charged Defendant based solely on the revelation that Fubar was an email moniker used by a person whose real world identity was Thomas Kennedy McCormick, because investigators had not yet obtained evidence that all the other email monikers linked to Fubar were also linked to Defendant, nor completed compiling all evidence they sought to prove his identity nor to explore the scope of offenses Defendant had committed. Moreover, the FBI then took further steps to investigate and locate Defendant during the time period of 2011-2013. The Government eventually learned that Defendant was not at the Cambridge address during 2011. He was not in Cambridge in the summer because he was at an internship.

Those additional and necessary facts were not established until he confessed to those facts, in part, on December 5, 2013. The search warrant was executed to obtain additional digital evidence in his possession, including evidence linking Defendant to other monikers—not as an excuse to let him grow older. Additional facts show a forensic analysis of the seized devices from his dorm room on December 5, 2013 did not happen until after they bypassed the incorrect passwords Defendant had provided the interviewing FBI agents in the December 5, 2013 interview. Consequently, the forensic analysis was delayed until after August, 2014 in part due to the difficulty in bypassing the password encryptions on the seized devices. In any event, the investigation developed on a normal course without any effort to delay or slow the investigation to attain some improper tactical advantage. Although the defense argues that the Government could have or should have (we are not altogether certain of the precision of their argument here) arrested Defendant immediately after January 28, 2011 (when they learned that "Fubar" was McCormick), the investigation was far from concluded. For the Government to satisfy their burden of proof beyond a reasonable doubt, it was important to obtain incriminating evidence that would

link the other monikers to Defendant and provide the kind of convincing evidence that Fubar and these other email monikers were utilized by Defendant (and not someone else) as an administrator of the Darkode forum.

Such action, although time consuming, does not show an intentional delay to "gain a tactical advantage." The defense cannot sustain the second prong of the Marion rule for pre-indictment delay. There is no procedural due process issue in this case just as there was none in Marion. See 404 U.S. at 325-326.

The defense has asked for and sought production of any reports of investigation demonstrating efforts to slow the progress of the investigation or to delay investigatory steps to gain any tactical advantage to await the defendant's attainment of the age of majority or otherwise. There were none to produce as there was no such intent and no such dilatory acts committed.[4]

**After December 2013.**

Other purported "delays" in returning an indictment are attributable to actions of Defendant because he condoned or procured the delay in indictment. For example, it was near August 2014 when Defendant executed his first debriefing agreement. (Exhibit 2). Thereafter, with the consent of Defendant, the Government began analyzing Defendant's debriefing assertions in hopes of reaching a mutually agreeable pre-indictment resolution involving his cooperation. The debriefings lasted from August 2014 until December 7, 2017, and obviously could not have been accomplished without the consent and full knowledge of Defendant and his counsel. This is hardly the kind of tactical ploy by the Government to deprive a defendant of a fair trial or to gain any

---

[4] Nor does Defendant explain why, if the Government's intent was to wait for Defendant to turn twenty-one in October, 2013, he was not charged until several years thereafter. This reveals Defendant's claimed theory of intentional delay to gain advantage to be non-sensical.

tactical advantage complained of in Marion.

### 3. Conducting a thorough investigation of a complex offense is not a delay to gain "tactical advantage" under Marion.

Still, the defense complains that the length of the delay should be considered and that the complexity of the case does not constitute a good rationale for the delay. Their protestations however, are not supported by the law. A delay caused by investigative processes does not constitute a delay to gain "tactical advantage" as required by Marion. See United States v. Lovasco, 431 U.S. 783, 795 (1977) (citing Marion, 404 U.S. at 324).

In Lovasco, the Supreme Court held that requiring the Government to file charges as soon as probable cause exists, even if the investigation into the entire criminal transaction is not complete, would be detrimental to every party involved: defendants, prosecutors, and courts. Giving prosecutors the discretion to complete their investigation before filing charges helps ensure (a) all members of a criminal transaction are brought to justice, (b) charges are not filed against innocent parties, and (c) prosecutors are given the opportunity to exercise their prosecutorial discretion to not bring charges against an individual. Lovasco, 431 U.S. at 792-794. Consequently, protestations by the defense that the FBI should have or could have arrested McCormick when he was eighteen, presumably after January 28, 2011, raise no constitutional concerns.

Like the Supreme Court, the D.C. Circuit has also rejected the defense's complaint that the length of the investigation somehow violates his rights. Specifically, investigative complexity is not a violation of a defendant's due process rights. See, e.g., United States v. Bridgeman, 523 F. 2d 1099 (D.C. Cir. 1975); accord United States v. Hoo, 825 F. 2d 667 (2nd Cir. 1987). For example, in Bridgeman, defendants who had participated in a prison riot alleged a pre-indictment delay was prejudicial. 523 F. 2d 1099. The D.C. Circuit found that because the delay was due to

"the magnitude and complexity of the crimes" it was not done for tactical advantage. Id. at 1112. Similarly, in Hoo, a young defendant who would have benefited from JDA protection if he had been charged with partaking in a RICO conspiracy a day earlier alleged an improper delay. 825 F. 2d at 667. The Second Circuit court upheld a trial ruling recognizing that delay to gather more evidence against a defendant was legitimate. Id. at 669.

In the instant case, the government was investigating a complex conspiracy that spanned a number of years and a criminal enterprise that persisted despite the arrest of some of its leaders in 2011 and 2012. The investigation involved collecting a large amount of digital evidence through a multitude and succession of search warrants and orders under 18 U.S.C. §2703(d). It also involved defendants who were conducting activities on the Darkode forum in foreign nations. If a prison riot in Washington D.C. in Bridgeman and another RICO conspiracy in Hoo were sufficiently complex as to justify a pre-indictment delay, then the timing of this far more involved investigation and prosecution should raise far fewer concerns. See Bridgeman, 523 F. 2d at 1112; Hoo, 825 F. 2d at 669.[5]

### 4. Defendant suffered no substantial prejudice because he would not have been prosecuted under the Juvenile Delinquency Act for crimes committed as an adult.

In addition to proving that the delay in the indictment was intentionally caused by the Government gain a tactical advantage (which they have not shown), the defense must also show that Defendant has suffered some substantial prejudice by the delay. To satisfy the substantial prejudice prong of the delay articulated in Marion, the defense asserts that Defendant could have

---

[5] Indeed, courts have find no error in refusal to apply the JDA to prosecutions with longer periods of delay than at issue here. See, e.g., United States v. Wright, 540 F.3d 833, 839 (8th Cir. 2008) (no JDA jurisdiction; defendant properly charged as an adult for offenses committed while under eighteen despite that he was indicted when he was twenty-eight years old);

benefited from JDA jurisdiction if he had been charged before his twenty-first birthday and that deprivation of JDA protection is prejudicial under the Due Process Clause of the Fifth Amendment. Yet Defendant would not have automatically been prosecuted with JDA protections if he had been charged while under the age of twenty-one.  Age twenty-one is of significance under the JDA because at that age, the juvenile court loses jurisdiction over the defendant.

Indeed, like Hoo, numerous Circuit Courts of Appeal have upheld adult prosecutions where the defendant's participation in the conspiracy includes juvenile conduct and participation after he turned eighteen.  See United States v. Delatorre, 157 F.3d 1205, 1209 (10th Cir. 1998) (RICO conspiracy; "No circuit has applied the JDA to an adult conspiracy or racketeering prosecution simply because defendant's participation in the crimes began prior to his eighteenth birthday."), citing United States v. Welch, 15 F.3d 1202, 1207–10 (1st Cir. 1993) (JDA inapplicable where indictment charged a conspiracy spanning defendants' eighteenth birthdays); United States v. Harris, 944 F.2d 784, 784–86 (10th Cir. 1991) (where defendant committed acts in furtherance of a drug conspiracy before and after his eighteenth birthday, district court had jurisdiction to try him as an adult without complying with the JDA); United States v. Wong, 40 F.3d 1347, 1364–66 (2d Cir. 1994) (where defendant committed predicate acts of racketeering before and after his eighteenth birthday, district court had jurisdiction to try him as an adult without complying with the JDA); see also Wong, 40 F.3d at 1365 ("It is well established that federal courts have jurisdiction over conspiracies begun while a defendant was a minor but completed after his eighteenth birthday"; collecting cases).

Here, Defendant is charged with crimes committed as an adult.  Under the JDA, an act of juvenile delinquency is considered to be a "violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult .

. ." 18 U.S.C. § 5031. Defendant is charged in all counts in the indictment for acts that occurred after October 15, 2010 or that continued after October 15, 2010, the day he turned eighteen. Although he facilitated the sale of the Zeus malware when he was seventeen years old, and did so over the Darkode forum, he continued participating in the conspiracy after he reached the age of majority. The indictment alleges numerous overt acts, such as Indictment ¶¶ 83 – 92, which occurred after Defendant reached the age of majority. The defense ignores, for example, his continued participation in the conspiracy after he reached the age of majority including 631 logins as an Administrator of the Darkode that occurred from 2012 through September, 2013; the intrusion into a website called ziddu.com in which he and another member harvested 4.8 million email addresses and passwords and posted them for sale on the Darkode forum; the possession of 30,000 stolen credit card accounts and personal identifying information on a USB thumb drive on December 5, 2013; the Aggravated Identity Fraud Counts Three through Seven which occurred on December 5, 2013, and Count Two, Bank and Wire Fraud Conspiracy which occurred over a period of time ending December 5, 2013. These acts occurred after he reached the age of majority and he could not have benefited from JDA jurisdiction because these violations did not occur prior to his eighteenth birthday—they occurred after October 15, 2010, when he was an adult.

**5. The Indictment's inclusion of overt acts committed by McCormick while a juvenile does not merit dismissal.**

The defense objects to the indictment's inclusion of allegations of Defendant's participation in Overt Acts 80-82 (involving the sale of the Zeus malware banking Trojan). These acts occurred while Defendant was seventeen and a juvenile under federal law. The defense's objection appears to be a kind of corollary to their Motion to Dismiss. But the inclusion of earlier juvenile acts is entirely proper and comports with the law in this Circuit.

The D.C. Circuit permits the prosecution of a defendant who joins a conspiracy before reaching the age of majority but who continues participation after reaching eighteen years of age. United States v. Thomas, 114 F.3d 228 (D.C. Cir. 1997). The Thomas decision stated:

> Under established circuit precedent, a defendant charged with conspiracy may be tried as an adult even if he first became involved in the conspiracy while still a minor, so long as he continues to participate in the conspiracy after reaching the age of eighteen. See United States v. Strothers, 316 U.S. App. D.C. 210, 77 F.3d 1389, 1392 (D.C. Cir.), cert. denied, 136 L. Ed. 2d 263, 117 S. Ct. 374 (1996); see also United States v. Spoone, 741 F.2d 680, 687 (4th Cir. 1984), cert. denied, 469 U.S. 1162 (1985) (relying on United States v. Chambers, 944 F.2d 1253, 1257 (6th Cir. 1991), cert. denied, 502 U.S. 1112, 117 L. Ed. 2d 455, 112 S. Ct. 1217 (1992) Id. at 238-39).

The inclusion of Defendant's involvement in these acts conducted in furtherance of the conspiracy is entirely appropriate. Defendant is not entitled to a ruling which excludes admission of evidence of this conduct.

However, out of an abundance of caution, to avoid the issues Defendant raises in a separate motion (Motion to Strike Overt Acts 80-82, Document 39), the Government will agree to strike Indictment ¶¶ 80 -82 (pertaining to Defendant's sale of the Zeus malware in 2009-2010) to avoid any question of juror confusion or misuse.

Defendant argues that these overt acts should be stricken to avoid "misuse by the jury." (Motion to Strike, page 4). That action may be an appropriate remedy to avoid allegations of "misuse" by the jury and as a practical matter, the Government's concession may be necessary to avoid unnecessary issues on appeal. Defendant is not, however, entitled to exclude evidence encompassed in those overt acts, even though Defendant committed them as a juvenile. Thomas directs that evidence of a defendant's participation in a "straddle" conspiracy (that is, conspiracies that the defendant joined as a juvenile, but ratified their participation after reaching the age of majority) is permitted but must be predicated on the adult acts he has committed, and the "jury

ordinarily must be so instructed." Id. at 266.   The issue is better appreciated by an understanding

of the nuances involved in the Thomas decision.

The Thomas decision explained that, at common law, an individual over the age of fourteen

had no immaturity protections against establishing criminal intent. See Thomas, 114 F.3d at 263.

The JDA expanded the protections for juveniles out of a belief that juveniles could still be

rehabilitated, and created a separate procedural process for individuals who committed criminal

acts before they turned eighteen. Id. Therefore, the JDA and courts interpreting the statute have

placed limits around (1) what types of cases involving pre-majority conduct can be brought as

adult criminal charges, and (2) how the evidence of pre-majority conduct can be used in those

cases.

Once an individual joins a conspiracy, they are considered a member of the conspiracy

until they make an affirmative withdrawal from the conspiracy. Thomas, 114 F.3d at 264.

However, given the protections provided by the JDA, courts have required a defendant to take an

affirmative step to ratify their participation in a conspiracy after they have reached the age of

majority, if they joined the conspiracy prior to the age of majority. Id. Every court that has

considered how to prosecute individuals in straddle conspiracies has noted that in order to

substantiate an adult criminal charge for a conspiracy that was entered into as a juvenile, the

defendant must have ratified their participation in the conspiracy after the age of majority. Id.

Ratification does not require the commission of a crime, but simply requires an affirmative action

taken by the defendant after he reaches the age of majority that demonstrates continued

involvement in the conspiracy. See, e.g., United States v. Machen, 576 Fed. 561, 566 (6th Cir.

2014) (the defendant's participation in the initiation of another individual into the gang after he

turned eighteen was sufficient evidence to ratify his continued participation in the conspiracy).

Although the decision is <u>Thomas</u> was reached after conducting an analysis of a split in the Circuits, the split in the Circuits involved how evidence of pre-majority conduct can be used in a conspiracy prosecution, not whether it can be used at all.[6] <u>Thomas</u> appears to treat its admission analogous to the way other crimes' evidence is admissible in accordance with Rule 404(b) of the Federal Rules of Evidence.  <u>See id.</u> at 265.

<u>Thomas</u> specifically rejects the notion that a defendant can be found guilty of adult criminal charges solely on the basis of criminal actions conducted as a juvenile. <u>Id.</u> at 266.  The court notes that "in our view, and we infer in that of allied courts as well, it is the adult participation that gives the district court jurisdiction over the eighteen to twenty-one year old defendant, evidence of continued membership in the conspiracy must be predicated on the adult acts and the jury ordinarily must be so instructed." <u>Id</u>. Therefore, the jury must be instructed that they can use pre-majority conduct as evidence of (1) probative knowledge of the conspiracy, (2) when the defendant joined the conspiracy, (3) the scope of the conspiracy the defendant agreed to, and (4) the foreseeability of the acts of co-conspirators. <u>Id</u>. However, the jury cannot use pre-majority conduct as evidence of guilt of conspiratorial conduct. <u>Id</u>. Consequently, it is not error to charge the pre-majority overt acts at issue in the indictment because the evidence is nevertheless admissible accompanied by an appropriate instruction as indicated in <u>Thomas</u>.

The danger of "misuse" of pre-majority overt acts by the jury who reads them in an indictment was not explicitly addressed by <u>Thomas</u>. But misuse was arguably the issue they hoped

---

[6] Although there is considerable negative treatment of the <u>Thomas</u> decision regarding how to treat pre-majority conduct in a straddle conspiracy, the Government is not in a position to argue that this Court should abandon it and follow for example, the Tenth Circuit in <u>United States v. Delatorre</u>, 157 F.3d 1204, 1209 (10th Cir. 1998).  In any event, following either side of the Circuit split, pre-majority conduct is admissible in a straddle conspiracy prosecution.

to address. The "misuse" issue can be avoided simply by striking the overt acts in the indictment, but the Court should allow the Government to introduce the evidence of the Zeus malware conduct in conjunction with a cautionary or limiting instruction directed by Thomas.

This could be addressed through a carefully-crafted instruction to the trial jury. However, out of an abundance of caution and to avoid unnecessary issues, the Government will agree to strike those paragraphs from the Indictment.

Nonetheless, the Court should still permit evidence of the 2010 Zeus malware sale to be admitted in the Government's case in chief in the manner directed by Thomas, as the evidence is still relevant for the jury to consider in a straddle conspiracy case. The evidence can be used to demonstrate Defendant's knowledge of the conspiracy and agreement to facilitate its purposes, how long he has participated in the conspiracy, and the foreseeability of the acts of his co-conspirators.

WHEREFORE, the Government respectfully asks the Court to deny the Motion to Dismiss the Indictment (Document 36).   Regarding the Motion to Strike Overt Acts 80-82 of the Indictment, the Government will agree to strike – out of an abundance of caution – but to admit evidence of the same as pre-majority conduct in a straddle conspiracy and accompany the admission of such evidence with an appropriate instruction according to Thomas.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

Peter V. Roman
Assistant United States Attorney
D.C. Bar Number 984996
Telephone: (202) 252-7115
Email: Peter.Roman@usdoj.gov

By: _____ /s/ _____
John P. Dominguez
Assistant United States Attorney
D.C. Bar 959809
Cyber Section
555 4th Street, N.W., Room 4229
Washington, D.C.  20530
Office: 202-252-7684;
Fax: 202-514-8707
John.Dominguez@usdoj.gov